# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT ISAACS Derivatively on Behalf of CABOT OIL & GAS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT KELLEY, RHYS J. BEST, W. MATT RALLS, DOROTHY M. ABLES, ROBERT S. BOSWELL, AMANDA M. BROCK, MARCUS A. WATTS, PETER B. DELANEY, DAN O. DINGES, and SCOTT C. SCHROEDER, <br><br> Individual Defendants, <br> -and- <br><br> CABOT OIL & GAS CORPORATION, a Delaware corporation, <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Robert Isaacs ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Cabot Oil & Gas Corporation ("Cabot" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Cabot's reputation, goodwill, and standing in the business community and has exposed Cabot to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Cabot in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.     This action seeks to remedy wrongdoing committed by Cabot's directors and officers from October 23, 2015 through the present (the "Relevant Period").

3.     Cabot is an oil and gas company engaged in the exploration, development, and production of natural gas properties in the United States. Cabot was incorporated in 1989 and is headquartered in Houston, Texas.

4.     Cabot's primary focus is on the Marcellus Shale located in Susquehanna County, Pennsylvania.

5.     In the Company's annual report filed on February 22, 2016 with the SEC on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"), Cabot disclosed that it had received a "proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania." Thereafter, in the Company's annual report filed on February 27, 2017 with the SEC on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), the Company disclosed that it had "entered into a Consent Order and Agreement with the PaDEP on December 30, 2016[.]" The Company agreed

to pay a "civil monetary penalty in the amount of approximately $0.3 million and . . . additional monitoring will be required to ensure the source of methane has been remediated."

6.      On July 26, 2019, Cabot filed its quarterly report with the SEC on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"), which disclosed that in June and November of 2017, PaDEP had served the Company with additional notices of violation relating to continued "gas migration allegations in an area surrounding several wells owned and operated by [Cabot] in Susquehanna County, Pennsylvania." The complaints were initially raised by residents of the area concerning their drinking water in March and June 2017. Furthermore, the Company had received two proposed consent orders and agreements from PaDEP, which exposed the Company to a combined maximum civil monetary penalty of $570,000.

7.      On this news, Cabot's share price dropped $2.63 (over 12%) from closing at $21.79 per share on July 25, 2019, to close at $19.16 per share on July 26, 2019.

8.      On March 3, 2020, the Attorney General of Pennsylvania, Josh Shapiro, stated "I can confirm that my office has more than a dozen ongoing criminal investigations into fracking and pipeline companies" and notified the media to "expect some will result in criminal charges in the near future."[1]

9.      On June 15, 2020, Cabot was charged by the Pennsylvania Attorney General's office with 15 criminal counts, including eight felonies, following a two-year state grand jury investigation into environmental crimes committed by shale gas companies across Pennsylvania.

10.     On this news, Cabot's share price dropped $0.67, or 3.3%, from closing at $20.07 per share on June 12, 2020 (Friday), to close at $19.40 per share on June 15, 2020 (Monday).

11.     In breach of their fiduciary duties during the Relevant Period, the Individual

---

[1] https://www.post-gazette.com/news/crime-courts/2020/03/03/shale-gas-fracking-pipelines-industry-PA-attorney-general-investigations/stories/202003030152?cid=search (Last visited on December 14, 2020).

Defendants made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants improperly failed to disclose that: (1) Cabot's environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania were insufficient, as they continuously received notices of violations; (2) this caused Susquehanna's water supplies to be polluted and endangered its citizens; (3) these environmental liabilities exposed Cabot to increased governmental scrutiny; (4) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; (5) these failures to fix the wells would clearly impact the Company's reputation, the reputation of creating unsafe drinking water for residents in Susquehanna; and (6) Cabot would be incapable of achieving its financial projections. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants breached their fiduciary duties in three parts: (1) they failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact; (2) they failed to maintain adequate internal environmental controls and procedures to ensure the Company was complying with relevant environmental laws and regulations; and (3) they caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. According to the Company's public filings with the SEC during the Relevant Period, approximately 46 million shares of the Company's common stock were repurchased between May 2017 and June 2019 for over $1.1 billion. As the Company's stock was artificially inflated during that time, the Company overpaid, in respect of these repurchases, by approximately $200 million in total.

13.    As detailed herein, and as alleged in the ongoing federal securities class action filed in this District styled *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.*, Case No. 3:20-cv-01815-CCC, (the "Securities Class Action"), Cabot's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction. The Securities Class Action is pending in this District.

16.    This Court has personal jurisdiction nominal defendant Cabot, because it is a corporation conducting business in this District. This Court has personal jurisdiction over each of the Individual Defendants because he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Individual Defendants various activities have had an effect in this District. Venue is proper in this District because the Company and the Individual Defendants have conducted business in this District and Individual Defendants' actions have had an effect in this District.

**THE PARTIES**

**Plaintiff**

18.     Plaintiff Robert Isaacs is and has continuously been a stockholder of Cabot during the wrongdoing complained of herein.

**Nominal Defendant**

19.     Defendant Cabot is a Delaware corporation with its principal executive offices located at 840 Gessner Road, Suite 1400, Houston, Texas 77024. Cabot's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "COG."

**Individual Defendants**

20.     Defendant Robert Kelley ("Kelley") has served as a director of the Company since 2003. He has been a member of the Audit Committee since at least 2015.

21.     Defendant Rhys J. Best ("Best") has been a Company director since 2008. He served on the Audit Committee in 2015 and 2016.

22.     Defendant W. Matt Ralls ("Ralls") has served as a director of the Company since 2011. He served as the Chairman of the Safety and Environmental Affairs Committee in 2015 and 2016.

23.     Defendant Dorothy M. Ables ("Ables") has been a Company director since December 2015. She is currently Chairwoman of the Audit Committee and has served as a member of the Audit Committee since 2016.

24.     Defendant Robert S. Boswell ("Boswell") has served as a Company director since December 2015. He continues to serve as a member of the Audit Committee since at least 2015.

25.     Defendant Amanda M. Brock ("Brock") has served as a Company director since August 2017. She is currently a member of the Audit Committee since October 25, 2017. Brock has also been a member of the Environment, Health & Safety Committee, formerly known as the

Safety and Environmental Affairs Committee, since 2017.

26.     Defendant Marcus A. Watts ("Watts") has served as a director of the Company since August 2017. He has been a member of the Environment, Health, and Safety Committee since 2017.

27.     Defendant Peter B. Delaney ("Delaney") has served as a Company director since August 2018. He has been a member of the Audit and Environment, Health and Safety Committees since 2018.

28.     Defendant Dan O. Dinges ("Dinges") has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board since May 2002. Dinges is a named defendant in the Securities Class Action. Dinges sold 66,610 shares at approximately $27.92 for proceeds of $1,859,751.

29.     Defendant Scott C. Schroeder ("Schroeder") has served as the Company's chief financial officer ("CFO") since February 2014. Schroeder is a named defendant in the Securities Class Action.

30.     Collectively, Individual Defendants Kelley, Best, Ralls, Ables, Boswell, Brock, Watts, Delaney, Dinges, and Schroeder, are referred to herein as the "Individual Defendants."

31.     Collectively, Individual Defendants Kelley, Best, Ralls, Ables, Boswell, Brock, Watts, Delaney, and Dinges, are referred to herein as "Director Defendants."

32.     Collectively, Individual Defendants Ables, Best, Boswell, Kelley, Brock, and Delaney, are referred to herein as the "Audit Committee Defendants." Collectively, Individual Defendants Kelley, Ralls, Boswell, Brock, Watts, and Delaney are referred to herein as the "Safety and Environmental Committee Defendants."

33.     The Individual Defendants, because of their positions with Cabot, possessed the power and authority to control the contents of Cabot's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and SEC filings alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

34.     Cabot is an oil and gas company engaged in the extraction of natural gas in the United States. The Company is primarily focused on the resources provided by the Marcellus Shale in Susquehanna County, Pennsylvania.

35.     In recent years, the Company has received numerous notices of violations and civil monetary penalties due to the contamination of well water used by Susquehanna residents.

### The Individual Defendants' False and Misleading Statements

*October 23, 2015 10-Q*

36.     On October 23, 2015, the Company filed Form 10-Q with the SEC for the quarter ended September 30, 2015 (the "3Q15 10-Q"). The 3Q15 10-Q downplayed Cabot's potential liabilities with respect to environmental matters and was signed by Defendants Dinges and Schroeder.

37.     Appended as an Exhibit, the Sarbanes-Oxley Act of 2002 ("SOX") certification was signed by Defendants Dinges and Schroeder.

38.     The 3Q15 stated, in part:

**Environmental Matters**

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

39.     The 3Q15 materially downplayed the potential impacts of the Company's liabilities regarding its conduct with gas wells in Susquehanna County.

40.     The above statements were materially misleading because they failed to disclose: (i) Cabot's environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania were insufficient; (ii) this caused Susquehanna's water supplies to be polluted and endangered its citizens; (iii) these environmental liabilities exposed Cabot to increased governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) Cabot would be incapable of achieving its financial projections.

*February 22, 2016 10-K*

41.     On February 22, 2016, the Company filed the 2015 10-K. The 2015 10-K was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls.

42.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

43.     The 2015 10-K stated, in part:

Our operations are subject to extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge

of materials into the environment. Permits are required for the operation of our various facilities. These permits can be revoked, modified or renewed by issuing authorities. Governmental authorities enforce compliance with their regulations through fines, injunctions or both. Government regulations can increase the cost of planning, designing, installing and operating, and can affect the timing of installing and operating, oil and natural gas facilities. Although we believe that compliance with environmental regulations will not have a material adverse effect on us, risks of substantial costs and liabilities related to environmental compliance issues are part of oil and natural gas production operations. No assurance can be given that significant costs and liabilities will not be incurred. Also, it is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from oil and natural gas production could result in substantial costs and liabilities to us.

***

**We believe that we substantially comply with the Clean Water Act and related federal and state regulations.**

***

*Environmental Matters*

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. **We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a **civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000.** We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in

monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added)

44.     The 2015 10-K flaunted Cabot's environmental and safety regulation compliance while downplaying the risks associated with its conduct in Pennsylvania. In addition, the 2015 10-K contained generic, boilerplate provisions regarding environmental safety.  These generic provisions were not tailored to Cabot's actual known risks regarding the Company's insufficient environmental controls and procedures or its failure to fix faulty gas wells that were contaminating Pennsylvania's water supplies. The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*May 3, 2016 10-Q*

45.     On May 3, 2016, the Company filed Form 10-Q with the SEC for the quarter ended March 31, 2016 (the "1Q16 10-Q"). The 1Q16 10-Q was signed by Defendants Dinges and Schroeder.

46.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

47.     The 1Q16 10-Q stated, in part:

***Environmental Matters***

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. **We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result

in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(Emphasis added)

48.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*July 29, 2016 10-Q*

49.     On July 29, 2016, the Company filed Form 10-Q with the SEC for the quarter ended June 30, 2016 (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendants Dinges and Schroeder.

50.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

51.     The 2Q16 10-Q stated, in part:

***Environmental Matters***

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. **We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000,

up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

(Emphasis added)

52.    The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*October 28, 2016 10-Q*

53.    On October 28, 2016, the Company filed Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendants Dinges and Schroeder.

54.    Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

55.    The 3Q16 10-Q stated, in part:

***Environmental Matters***

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. **We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to

approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

56.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*February 27, 2017 10-K*

57.     On February 27, 2017, the Company filed the 2016 10-K. The 2016 10-K was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls.

58.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

59.     The 2016 10-K stated, in part:

**Environmental Matters**

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. **We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.** Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane

has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added)

60.    The above statements were materially misleading because they failed to disclose that, despite assurances that the Company had remediated the faulty gas wells in Susquehanna County, the Company continued to contaminate water supplies in the area. The 2016 10-K was materially misleading because it flaunted Cabot's environmental and safety regulation compliance while downplaying the risks associated with its conduct in Pennsylvania. In addition, the 2016 10-K contained generic, boilerplate provisions regarding environmental safety.  These generic provisions were not tailored to Cabot's actual known risks regarding the Company's insufficient environmental controls and procedures or its failure to fix faulty gas wells that were contaminating Pennsylvania's water supplies. The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*April 28, 2017 10-Q*

61.    On April 28, 2017, the Company filed Form 10-Q with SEC for the quarter ended March 31, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendants Dinges and Schroeder.

62.    Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

63.     The 1Q17 10-Q stated in part:

***Environmental Matters***

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

64.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*July 28, 2017 10-Q*

65.     On July 28, 2017, the Company filed Form 10-Q with the SEC for the quarter ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Dinges and Schroeder.

66.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

67.     The 2Q17 10-Q stated, in part:

***Environmental Matters***

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

68.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*October 30, 2017 10-Q*

69.     On October 30, 2017, the Company filed Form 10-Q with the SEC for the quarter ended on September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Dinges and Schroeder.

70.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

71.     The 3Q17 10-Q stated, in part:

**Environmental Matters**

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

72.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*March 1, 2018 10-K*

73.     On March 1, 2018, the Company filed Form 10-K with the SEC for the quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts.

74.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

75.     The 2017 10-K stated, in part:

Our operations are subject to extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment. Permits are required for the operation of our various facilities. These permits can be revoked, modified or renewed by issuing authorities. Governmental authorities enforce compliance with their regulations

through fines, injunctions or both. Government regulations can increase the cost of planning, designing, installing and operating, and can affect the timing of installing and operating, oil and natural gas facilities. Although we believe that compliance with environmental regulations will not have a material adverse effect on us, risks of substantial costs and liabilities related to environmental compliance issues are part of oil and natural gas production operations. No assurance can be given that significant costs and liabilities will not be incurred. Also, it is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from oil and natural gas production could result in substantial costs and liabilities to us.

***

**We believe that we substantially comply with the Clean Water Act and related federal and state regulations.**

***

### Environmental Matters

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

76.     The above statements were materially misleading because the 2017 10-K flaunted Cabot's environmental and safety regulation compliance while downplaying the risks associated with its conduct in Pennsylvania. In addition, the 2017 10-K contained generic, boilerplate provisions regarding environmental safety.  These generic provisions were not tailored to Cabot's actual known risks regarding the Company's insufficient environmental controls and procedures or its failure to fix faulty gas wells that were contaminating Pennsylvania's water supplies. The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*April 27, 2018 10-Q*

77.     On April 27, 2018, the Company filed Form 10-Q with the SEC for the quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Dinges and Schroeder.

78.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

79.     The 1Q18 10-Q stated, in part:

**Environmental Matters**

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

80.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*July 27, 2018 10-Q*

81.     On July 27, 2018, the Company filed Form 10-Q with the SEC for the quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Dinges and Schroeder.

82.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

83.     The 2Q18 10-Q stated, in part:

**Environmental Matters**

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in

19

fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

84.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*October 26, 2018 10-Q*

85.     On October 26, 2018, the Company filed Form 10-Q with the SEC for the quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Dinges and Schroeder.

86.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

87.     The 3Q18 10-Q stated, in part:

**Environmental Matters**

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

88.     The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*February 26, 2019 10-K*

89.     On February 26, 2019, the Company filed Form 10-K with the SEC for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Delaney, Kelley, Ralls, and Watts.

90.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

91.    The 2018 10-K stated, in part:

Our operations are subject to extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment. Permits are required for the operation of our various facilities. These permits can be revoked, modified or renewed by issuing authorities. Governmental authorities enforce compliance with their regulations through fines, injunctions or both. Government regulations can increase the cost of planning, designing, installing and operating, and can affect the timing of installing and operating, oil and natural gas facilities. Although we believe that compliance with environmental regulations will not have a material adverse effect on us, risks of substantial costs and liabilities related to environmental compliance issues are part of oil and natural gas production operations. No assurance can be given that significant costs and liabilities will not be incurred. Also, it is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from oil and natural gas production could result in substantial costs and liabilities to us.

*** 

**We believe that we substantially comply with the Clean Water Act and related federal and state regulations.**

*** 

*Environmental Matters*

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

92.    The above statements were materially misleading because the 2018 10-K flaunted Cabot's environmental and safety regulation compliance while downplaying the risks associated with its conduct in Pennsylvania. In addition, the 2018 10-K contained generic, boilerplate provisions regarding environmental safety. These generic provisions were not tailored to Cabot's actual known risks regarding the Company's insufficient environmental controls and procedures or its failure to fix faulty gas wells that were contaminating Pennsylvania's water supplies. The

above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*April 26, 2019 10-Q*

93.     On April 26, 2019, the Company filed Form 10-Q with the SEC for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Dinges and Schroeder.

94.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

95.     The 1Q19 10-Q stated, in part:

**Environmental Matters**

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

96.     The above statements were materially misleading because of the same reasons stated in ¶ 42 herein.

97.     The above statements in ¶¶ 36-96 were materially misleading because they failed to disclose: (i) Cabot's environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania were insufficient; (ii) this caused Susquehanna's water supplies to be polluted and endangered its citizens; (iii) these environmental liabilities exposed Cabot to increased governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) Cabot would be incapable of achieving its financial projections.

**The Truth Begins to Emerge**

*July 26, 2019 10-Q*

98.     On July 26, 2019, the Company filed the 2Q19 10-Q. The 2Q19 10-Q was signed by Defendants Dinges and Schroeder.

99.     Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

100.    The 2Q19 10-Q stated, in part:

On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. **We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added)

101.    Immediately after the release of the 2Q19 10-Q, the Company's stock price closed on July 26, 2019 at $19.16 per share, or 12.07% less than the previous day's closing price. It also traded at an unusually high volume.

102.    Cabot's shares continued to trade at artificially inflated prices due to Individual Defendants' continued misleading statements related to the Company's insufficient environmental controls and procedures and potential liability for those insufficient controls and procedures. For instance, the 2Q19 10-Q states "With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter."

103.    The above statements were materially misleading because of the same reasons stated in ¶ 40 herein.

*October 25, 2019 10-Q*

104.    On October 25, 2019, the Company filed Form 10-Q with the SEC for the quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Dinges and Schroeder.

105.    Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

106.    The 3Q19 10-Q stated, in part:

On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the

provision of alternative sources of drinking water to the affected residents. **We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

(Emphasis added)

107.    The above statements were materially misleading because of the same reasons stated in ¶ 40 and Cabot's shares continued to trade at artificially inflated prices due to Individual Defendants' continued misleading statements related to the Company's insufficient environmental controls and procedures and potential liability for those insufficient controls and procedures. For instance, the 3Q19 10-Q states "With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter."

*February 25, 2020 10-K*

108.    On February 25, 2020, the Company filed Form 10-K with the SEC for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants

Dinges, Schroeder, Ables, Best, Boswell, Brock, Delaney, Kelley Ralls, and Watts.

109.   Appended as an Exhibit, the SOX certification was signed by Defendants Dinges and Schroeder.

110.   The 2019 10-K stated, in part:

On June 17, 2019, we received two proposed Consent Order and Agreements (CO&A) from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents. **We received Notices of Violation (NOV) from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter.** The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, the proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

111.   The 2019 10-K contained substantively the same representations in the 2Q19 10-Q and 3Q19 10-Q, continuing to mislead stockholders. It continued to flaunt the Company's environmental and safety regulation compliance while downplaying the risks associated with such compliance, which contained generic, representations regarding the Company's risks related to

environmental and safety regulations. These provisions were not tailored to Cabot's actual known risks regarding the Company's insufficient environmental controls and procedures, its failure to fix faulty gas wells that were contaminating Pennsylvania's water supplies, and which reassured investors regarding the Company's response to ongoing environmental matters regarding gas wells in Pennsylvania.

112.    The statements referenced above were materially misleading because Defendants made misleading statements, as well as failed to disclose: (i) Cabot's environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania were insufficient; (ii) this caused Susquehanna's water supplies to be polluted and endangered its citizens; (iii) these environmental liabilities exposed Cabot to increased governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) Cabot would be incapable of achieving its financial projections.

**The Truth Finally Emerges**

113.    On March 3, 2020, the Attorney General of Pennsylvania, Josh Shapiro, stated "I can confirm that my office has more than a dozen ongoing criminal investigations into fracking and pipeline companies" and notified the media to "expect some will result in criminal charges in the near future."[2]

114.    On June 15, 2020, the Pennsylvania Attorney General's office charged Cabot with fifteen criminal accounts arising from its failure to fix faulty gas wells, following a grand jury investigation.

115.    A *Seattle Times* article reported, in part:

"Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians. They put their bottom line ahead

---

[2] https://www.post-gazette.com/news/crime-courts/2020/03/03/shale-gas-fracking-pipelines-industry-PA-attorney-general-investigations/stories/202003030152?cid=search (Last visited on December 14, 2020).

of the health and safety of our neighbors," Attorney General Josh Shapiro said in a video statement.[3]

116.    A press release from the Attorney General's office stated, in part:

The Pennsylvania Office of Attorney General, in conjunction with the 43rd Statewide Grand Jury, is charging Cabot with 7 counts of Prohibition Against Discharge of Industrial Wastes, 7 counts of Prohibition Against Other Pollutions and one count of Unlawful Conduct under the Clean Streams Law.

The Grand Jury's investigation into the contamination of well water in Dimock, Susquehanna County, revealed that Cabot's fracking activities were responsible for methane pollution in the local water supply.

117.    On this news, Cabot's share price dropped $0.67, or 3.3%, to close at $19.40 on

June 15, 2020 from closing at $20.07 per share on June 12, 2020.

118.    The criminal action remains ongoing. Cabot's most recently filed Form 10-Q with

the SEC for the quarter ended September 30, 2020, spoke to the ongoing criminal action as follows:

In June 2020, the Office of Attorney General of the Commonwealth of Pennsylvania informed the Company that it will pursue certain misdemeanor and felony charges against the Company related to alleged violations of the Pennsylvania Clean Streams Law, which prohibits discharge of industrial wastes. The Company is vigorously defending itself against such charges; however, the proceedings could result in fines or penalties against the Company. At this time, it is not possible to estimate the amount of any fines or penalties, or the range of such fines or penalties, that are reasonably possible in this case.

119.    As a result of the Individual Defendants' materially misleading statements, the

Company has undergone financial and reputational harm. The Company was further harmed by

the repurchases of stock while the price was inflated due to Individual Defendants' misleading

statements.

**The Company Repurchased Stock at Artificially Inflated Prices**

120.    During the Relevant Period, the Individual Defendants caused the Company to

---

[3] https://www.seattletimes.com/nation-world/nation/driller-charged-over-contamination-in-gasland-town/ (Last visited on December 15, 2020).

repurchase common stock at artificially inflated prices. In total, the Company spent approximately $1 billion to repurchase approximately 45.5 million shares of its own common stock from November 2017 through June 2019.

121.    The list below outlines the dates of repurchase, amount of shares repurchased, what the inflated stock price was at that time, the actual value of the shares, and the difference between the inflated prices and the actual value (Overpayment):

| Date Purchased | # of Shares Purchased | Price /Share | Total | Total (if purchased at $19.40) | Overpayment |
|---|---|---|---|---|---|
| Nov-17 | 177,900 | 27.81 | $ 4,947,399.00 | $ 3,451,260.00 | $ 1,496,139.00 |
| Dec-17 | 1,822,100 | 27.71 | $ 50,490,391.00 | $ 35,348,740.00 | $15,141,651.00 |
| Mar-18 | 8,327,781 | 24.85 | $ 206,945,357.85 | $ 161,558,951.40 | $45,386,406.45 |
| Apr-18 | 1,645,998 | 23.40 | $ 38,516,353.20 | $ 31,932,361.20 | $ 6,583,992.00 |
| Jun-18 | 10,000,000 | 23.56 | $ 235,600,000.00 | $ 194,000,000.00 | $41,600,000.00 |
| Aug-18 | 39,037 | 22.87 | $ 892,776.19 | $ 757,317.80 | $ 135,458.39 |
| Sep-18 | 7,131,508 | 22.67 | $ 161,671,286.36 | $ 138,351,255.20 | $23,320,031.16 |
| Oct-18 | 2,829,455 | 23.17 | $ 65,558,472.35 | $ 54,891,427.00 | $10,667,045.35 |
| Dec-18 | 8,500,000 | 22.84 | $ 194,140,000.00 | $ 164,900,000.00 | $29,240,000.00 |
| Apr-19 | 80,933 | 25.47 | $ 2,061,363.51 | $ 1,570,100.20 | $ 491,263.31 |
| May-19 | 2,250,000 | 25.44 | $ 57,240,000.00 | $ 43,650,000.00 | $13,590,000.00 |
| Jun-19 | 2,750,000 | 23.95 | $ 65,862,500.00 | $ 53,350,000.00 | $12,512,500.00 |
|  | 45,554,712 |  | $ 1,083,925,899.46 | $ 883,761,412.80 | $ 200,164,486.66 |

122.    In total, the Company overpaid approximately $200 million for stock repurchases.

**The Misleading Proxy Statements[4]**

123.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, Ables, Best, Boswell, Dinges, Kelley, Ralls, Brock, Watts, and Delaney (the "Proxy Defendants") also caused the Company to issue false and misleading

---

[4] These proxy allegations were based solely on negligence, they were not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

proxy statements during the Relevant Period. Defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls drafted, approved, and/or reviewed two Proxy Statements before they were filed with the SEC on March 22, 2016 (the "2016 Proxy") and March 21, 2017 (the "2017 Proxy"). Defendants Ables, Best, Boswell, Dinges, Kelley, Ralls, Brock, and Watts drafted, approved, and/or reviewed a Proxy Statement before it was filed with the SEC on March 22, 2018 (the "2018 Proxy"). Defendants Ables, Best, Boswell, Dinges, Kelley, Ralls, Brock, Watts, and Delaney drafted, approved, and/or reviewed a Proxy Statement before it was filed with the SEC on March 19, 2019 (the "2019 Proxy"). The Proxy Defendants negligently issued materially misleading statements in the 2016 Proxy, 2017 Proxy, 2018 Proxy, and the 2019 Proxy (the "Proxies").

124.    The 2016 Proxy sought stockholder votes to, among others, elect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls for a one-year term.

125.    In support of the Proxy Defendants' bid to elect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls, the 2016 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Cabot faces, including legal and regulatory risks, financial controls, and risks associated with environmental safety. The 2016 Proxy first stated:

**Board of Directors Oversight of Risk**

The Board of Directors considers risk oversight to be an integral part of its role, and discussions regarding risks faced by the Company are part of its meetings and deliberations throughout the year. Our Corporate Governance Guidelines provide that the Board is responsible for assessing major risks facing the Company and reviewing options for their mitigation. At the direction of the Board, management is responsible for implementing an enterprise risk management process and reporting to the Board at least annually regarding its assessment of risks that could have a significant impact on the Company and the strategies for their mitigation. In this way, the Board is engaged in risk oversight at the enterprise level.

**The Board is also engaged in risk oversight through regular reports from the Audit Committee. The Audit Committee is charged with reviewing with management and the Company's internal auditors the Company's major financial exposures and the steps management has taken to monitor and**

**control those exposures.** The Audit Committee receives periodic reports from management on these areas of potential exposure, including litigation, commodity price hedging, liquidity and capital resources, financial reporting and disclosures and regulatory risks, among others. The Audit Committee also receives reports from management regarding compliance with our Code of Business Conduct. The Audit Committee reviews at least annually the Company's policies and guidelines concerning financial risk assessment and financial risk management, with the assistance of the Company's internal auditors, KPMG LLP. KPMG LLP conducts a process of assessing major risks, including management interviews, and presents and discusses with the Audit Committee its conclusions regarding the Company's major risks. From this process, areas of concern are identified and considered and the internal audit plan is developed. Results of these reviews and audits are presented to the Audit Committee throughout the year. At each regular Board meeting, the Audit Committee Chairman reports to the Board regarding the activities of the Committee.

\*\*\*

## Code of Business Conduct

**All employees, officers and directors are required to comply with the Company's Code of Business Conduct** to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior. The Code of Business Conduct covers all areas of professional conduct, including conflicts of interest, customer relationships, insider trading, financial disclosure, intellectual property and confidential information, as well as requiring strict adherence to all laws and regulations applicable to the Company's business. Employees, officers and directors are required annually to reply to a Code of Conduct Questionnaire, which is designed to elicit information related to any known or possible violation of the Code. The full text of the Code of Business Conduct can be found on the Company's website at www.cabotog.com by choosing "About Cabot," and then choosing "Governance." The Company will satisfy the requirement to disclose any amendments to or waivers from certain provisions of its Code of Business Conduct by posting such information on the website at that location.

\*\*\*

**Audit Committee.** The function of the Audit Committee is to assist the Board in overseeing:

- The integrity of the financial statements of the Company;
- The compliance by the Company with legal and regulatory requirements;
- The independence, qualifications, performance and compensation of the Company's independent auditors; and
- The performance of the Company's internal audit function.

It is the policy of the Audit Committee to pre-approve all audit, review or attest engagements and permissible non-audit services, including the fees and terms thereof, to be performed by the independent auditors, subject to, and in compliance with, the de minimis exception for non-audit services described in Section 10A (i)(1)(B) of the Securities Exchange Act of 1934 and the applicable rules and regulations of the Securities and Exchange Commission (the "SEC"). The Audit Committee has delegated to each member of the Audit Committee authority to pre-approve permissible services to be performed by the independent auditors. Decisions of a member to pre-approve permissible services must be reported to the full Audit Committee at its next scheduled meeting.

Each member of the Audit Committee satisfies the financial literacy and independence requirements of the NYSE listing standards. The Board has determined that Mr. Kelley meets the requirements of an "audit committee financial expert" as defined by the SEC.

***

**Safety and Environmental Affairs Committee.** The function of the Safety and Environmental Affairs (Safety) Committee is to assist the Board in providing oversight and support of the Company's safety and environmental policies, programs and initiatives. Among other things, **the Safety Committee reviews our compliance with environmental, health and safety laws and regulations**, pending legislative and regulatory initiatives, training initiatives and, as needed, consults with outside and internal advisors regarding the management of the Company's safety and environmental policies, programs and initiatives.

(Emphasis added)

126.    Second, the 2016 Proxy stated:

**AUDIT COMMITTEE REPORT**

The Audit Committee is composed of three independent, non-employee directors. The Board of Directors has made a determination that the members of the Audit Committee satisfy the requirements of the NYSE listing standards as to independence, financial literacy and experience. The Board determined that one of the members of the Audit Committee, Mr. Kelley, is an "audit committee financial expert" as defined by rules of the SEC. The responsibilities of the Audit Committee are set forth in the Audit Committee Charter, as amended from time to time by the Board of Directors, which is included on the Company's website at www.cabotog.com. The function of the Audit Committee is to review and report to the Board of Directors with respect to various auditing and accounting matters, including overseeing the integrity of the financial statements of the Company, the compliance by the Company with legal and regulatory requirements, the selection,

independence, qualifications, performance and compensation of the Company's independent registered public accounting firm and the performance of the Company's internal audit function. The Audit Committee also reviews its charter annually. This is a report on the Audit Committee's activities relating to 2015.

### Review of Audited Financial Statements with Management

The Audit Committee reviewed and discussed the audited financial statements and management's discussion and analysis of the Company's financial condition and results of operations with the management of the Company.

### Review of Financial Statements and Other Matters with Independent Registered Public Accounting Firm

The Audit Committee discussed with the independent registered public accounting firm the matters required to be discussed as described in Statement on Auditing Standards ("SAS") No. 16 - Communication with Audit Committees. The Audit Committee has received and reviewed the written disclosures and the letter from PricewaterhouseCoopers LLP ("PWC"), the Company's independent registered public accounting firm, required by applicable Public Company Accounting Oversight Board requirements regarding the firm's communications with the Audit Committee concerning independence and has discussed with PWC the independent registered public accounting firm's independence. These discussions included a review of all audit and non-audit services (including tax services) provided by PWC to the Company.

### Recommendation that Financial Statements be Included in the Annual Report

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2015 and filed with the SEC.

127.    The 2016 Proxy assured stockholders that the Individual Defendants were involved with Cabot's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (i) Cabot's insufficient environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania; (ii) causing Susquehanna's water supplies to be contaminated

and endangered its citizens; (iii) environmental liabilities that exposed Cabot to increased governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) that Cabot would be incapable of achieving its financial projections.

128.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to elect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls.

129.    The 2017 Proxy sought stockholder votes to, among others, reelect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls for a one-year term.

130.    In support of the Proxy Defendants' bid to reelect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls, the 2017 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Cabot faces, including legal and regulatory risks, financial controls, and risks associated with environmental safety. The 2017 Proxy first repeated, in relevant part, the 2016 Proxy's Oversight of Risk, Code of Business Conduct, the Audit Committee's functions, and the Safety and Environmental Affairs Committee's functions

131.    Second, the 2017 Proxy stated:

**AUDIT COMMITTEE REPORT**

The Audit Committee is composed of four independent, nonemployee directors. The Board of Directors has made a determination that the members of the Audit Committee satisfy the requirements of the NYSE listing standards as to independence, financial literacy and experience. The Board determined that one of the members of the Audit Committee, Mr. Kelley, is an "audit committee financial expert" as defined by rules of the SEC. The responsibilities of the Audit Committee are set forth in the Audit Committee Charter, as amended from time to time by the Board of Directors, which is included on the Company's website. The function of the Audit Committee is to review and report to the Board of Directors with respect to various auditing and accounting matters, including overseeing the integrity of the financial statements of the Company, the compliance by the Company with legal and regulatory requirements, the selection, independence, qualifications,

performance and compensation of the Company's independent registered public accounting firm and the performance of the Company's internal audit function. The Audit Committee also reviews its charter annually. This is a report on the Audit Committee's activities relating to 2016.

### Review of Audited Financial Statements with Management

The Audit Committee reviewed and discussed the audited financial statements and management's discussion and analysis of the Company's financial condition and results of operations with the management of the Company.

### Review of Financial Statements and Other Matters with Independent Registered Public Accounting Firm

The Audit Committee discussed with the independent registered public accounting firm the matters required to be discussed as described in Statement on Auditing Standards ("SAS") No. 16 - Communication with Audit Committees. The Audit Committee has received and reviewed the written disclosures and the letter from PricewaterhouseCoopers LLP ("PWC"), the Company's independent registered public accounting firm, required by applicable Public Company Accounting Oversight Board requirements regarding the firm's communications with the Audit Committee concerning independence and has discussed with PWC the independent registered public accounting firm's independence. These discussions included a review of all audit and non-audit services (including tax services) provided by PWC to the Company.

### Recommendation that Financial Statements be Included in the Annual Report

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016 and filed with the SEC.

132.   The 2017 Proxy assured stockholders that the Individual Defendants were involved with Cabot's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (i) Cabot's insufficient environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania; (ii) causing Susquehanna's water supplies to be contaminated and endangered its citizens; (iii) environmental liabilities that exposed Cabot to increased

governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) that Cabot would be incapable of achieving its financial projections.

133.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls for a one-year term.

134.    The 2018 Proxy sought stockholder votes to, among others, reelect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls and elect Brock and Watts for a one-year term.

135.    In support of the Proxy Defendants' bid to reelect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls and elect Brock and Watts, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Cabot faces, including legal and regulatory risks, financial controls, and risks associated with environmental safety. The 2018 Proxy first repeated, in relevant part, the 2017 Proxy and 2016 Proxy's Oversight of Risk, Code of Business Conduct, the Audit Committee's functions, and the Safety and Environmental Affairs Committee's functions.

136.    Second, the 2018 Proxy stated:

**AUDIT COMMITTEE REPORT**

The Audit Committee is composed of four independent, nonemployee directors. The Board of Directors has made a determination that the members of the Audit Committee satisfy the requirements of the NYSE listing standards as to independence, financial literacy and experience. The Board determined that one of the members of the Audit Committee, Mr. Kelley, is an "audit committee financial expert" as defined by rules of the SEC. The responsibilities of the Audit Committee are set forth in the Audit Committee Charter, as amended from time to time by the Board of Directors, which is included on the Company's website. The function of the Audit Committee is to review and report to the Board of Directors with respect to various auditing and accounting matters, including overseeing the integrity of the financial statements of the Company, the compliance by the Company with legal and regulatory requirements, the selection, independence, qualifications,

performance and compensation of the Company's independent registered public accounting firm and the performance of the Company's internal audit function. The Audit Committee also reviews its charter annually. This is a report on the Audit Committee's activities relating to 2017.

### Review of Audited Financial Statements with Management

The Audit Committee reviewed and discussed the audited financial statements and management's discussion and analysis of the Company's financial condition and results of operations with the management of the Company.

### Review of Financial Statements and Other Matters with Independent Registered Public Accounting Firm

The Audit Committee discussed with the independent registered public accounting firm the matters required to be discussed as described in Statement on Auditing Standards ("SAS") No. 16 - Communication with Audit Committees. The Audit Committee has received and reviewed the written disclosures and the letter from PricewaterhouseCoopers LLP ("PWC"), the Company's independent registered public accounting firm, required by applicable Public Company Accounting Oversight Board requirements regarding the firm's communications with the Audit Committee concerning independence and has discussed with PWC the independent registered public accounting firm's independence. These discussions included a review of all audit and non-audit services (including tax services) provided by PWC to the Company.

### Recommendation that Financial Statements be Included in the Annual Report

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2017 and filed with the SEC.

137.    The 2018 Proxy assured stockholders that the Individual Defendants were involved with Cabot's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (i) Cabot's insufficient environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania; (ii) causing Susquehanna's water supplies to be contaminated and endangered its citizens; (iii) environmental liabilities that exposed Cabot to increased

governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) that Cabot would be incapable of achieving its financial projections.

138.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Ables, Best, Boswell, Dinges, Kelley, and Ralls and elect Brock and Watts for a one-year term.

139.    The 2019 Proxy sought stockholder votes to, among others, reelect defendants Ables, Best, Boswell, Dinges, Kelley, Ralls, Brock, and Watts and elect Delaney for a one-year term.

140.    In support of the Proxy Defendants' bid to reelect defendants Ables, Best, Boswell, Dinges, Kelley, Ralls, Brock, and Watts and elect Delaney, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Cabot faces, including legal and regulatory risks, financial controls, and risks associated with environmental safety.

141.    First, the 2019 Proxy stated:

**Board of Directors Oversight of Risk**

The Board of Directors considers risk oversight to be an integral part of its role, and discussions regarding risks faced by the Company are part of its meetings and deliberations throughout the year. Our Corporate Governance Guidelines provide that the Board is responsible for assessing major risks facing the Company and reviewing options for their mitigation. At the direction of the Board, management is responsible for implementing an enterprise risk management process and reporting to the Board at least annually regarding its assessment of risks that could have a significant impact on the Company and the strategies for their mitigation. Additionally, at each regular quarterly meeting of the Board, management presents an in-depth analysis of one of the top risks identified in the annual enterprise risk management process. In this way, the Board is engaged in risk oversight at the enterprise level.

The Board is also engaged in risk oversight through regular reports from the Audit Committee. **The Audit Committee is charged with reviewing with management and the Company's internal auditors the Company's major financial**

**exposures and the steps management has taken to monitor and control those exposures.** The Audit Committee receives periodic reports from management on these areas of potential exposure, including litigation, commodity price hedging, liquidity and capital resources, financial reporting and disclosures and regulatory risks, among others. The Audit Committee also receives reports from management regarding compliance with our Code of Business Conduct. The Audit Committee reviews at least annually the Company's policies and guidelines concerning financial risk assessment and financial risk management, with the assistance of the Company's internal auditors, KPMG LLP. KPMG LLP conducts a process of assessing major risks, including management interviews, and presents and discusses with the Audit Committee its conclusions regarding the Company's major risks. From this process, areas of concern are identified and considered and the internal audit plan is developed. Results of these reviews and audits are presented to the Audit Committee throughout the year. At each regular Board meeting, the Audit Committee Chairman reports to the Board regarding the activities of the Committee.

(Emphasis added)

142.    Second the 2019 Proxy reiterated, in relevant part, the 2018 Proxy, the 2017 Proxy, and the 2016 Proxy's Code of Business Conduct, the Safety and Environmental Affairs Committee's functions, and the Audit Committee's functions. With respect to the Audit Committee, the "Board has determined that Ms. Ables meets the requirements of an "audit committee financial expert" as defined by the SEC."

143.    Third, the 2019 Proxy stated:

**AUDIT COMMITTEE REPORT**

The Audit Committee is composed of four independent, nonemployee directors. The Board of Directors has made a determination that the members of the Audit Committee satisfy the requirements of the NYSE listing standards as to independence, financial literacy and experience. The Board determined that one of the members of the Audit Committee, Mr. Kelley, is an "audit committee financial expert" as defined by rules of the SEC. The responsibilities of the Audit Committee are set forth in the Audit Committee Charter, as amended from time to time by the Board of Directors, which is included on the Company's website. The function of the Audit Committee is to review and report to the Board of Directors with respect to various auditing and accounting matters, including overseeing the integrity of the financial statements of the Company, the compliance by the Company with legal and regulatory requirements, the selection, independence, qualifications, performance and compensation of the Company's independent registered public accounting firm and the performance of the Company's internal audit function. The

39

Audit Committee also reviews its charter annually. This is a report on the Audit Committee's activities relating to 2018.

### Review of Audited Financial Statements with Management

The Audit Committee reviewed and discussed the audited financial statements and management's discussion and analysis of the Company's financial condition and results of operations with the management of the Company.

### Review of Financial Statements and Other Matters with Independent Registered Public Accounting Firm

The Audit Committee discussed with the independent registered public accounting firm the matters required to be discussed as described in Statement on Auditing Standards ("SAS") No. 16 - Communication with Audit Committees. The Audit Committee has received and reviewed the written disclosures and the letter from PricewaterhouseCoopers LLP ("PWC"), the Company's independent registered public accounting firm, required by applicable Public Company Accounting Oversight Board requirements regarding the firm's communications with the Audit Committee concerning independence and has discussed with PWC the independent registered public accounting firm's independence. These discussions included a review of all audit and non-audit services (including tax services) provided by PWC to the Company.

### Recommendation that Financial Statements be Included in the Annual Report

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2018 and filed with the SEC.

144.    The 2019 Proxy assured stockholders that the Individual Defendants were involved with Cabot's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (i) Cabot's insufficient environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania; (ii) causing Susquehanna's water supplies to be contaminated and endangered its citizens; (iii) environmental liabilities that exposed Cabot to increased

governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) that Cabot would be incapable of achieving its financial projections.

145.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Ables, Best, Boswell, Dinges, Kelley, Ralls, Brock, and Watts and elect Delaney for a one-year term.

146.    The Proxies were false and misleading because, while they assured investors that Cabot's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal years, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

## FIDUCIARY DUTIES

147.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Cabot and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Cabot in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Cabot and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

148.    Each Individual Defendant owes and continues to owe Cabot, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

149.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cabot, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial

positions with Cabot, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

150.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how Cabot conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

151.    The Individual Defendants, as officers and/or directors of Cabot, were bound by the Company's Code of Business Conduct[5] (the "Code of Conduct") which required the following:

This Code of Business Conduct (the "Code") assembles into one document those corporate policies that COGC and its subsidiaries (the "Company") have

---

[5] See Cabot's Code of Business Conduct:
https://s26.q4cdn.com/162280839/files/doc_downloads/governance/Code-Business-Conduct.pdf

established in order to define certain responsibilities of the Company's employees and provide guidance in conducting the Company's business in the most ethical and proper manner.

***

To ensure that every employee abides by the Company's commitment to the principles of this Code, the Company will require that every director, officer, and employee sign a statement that he or she understands and will comply with the principles contained in this Code and will ensure that all employees comply with these policies.

This Code applies to the Company and to the Company's affiliates. This Code also applies to the Company's independent contractors and consultants. The term "employee" as used in this Code includes directors and officers as well as all other employees of the Company. We sometimes specifically refer to directors, officers and employees for emphasis. In other instances we only refer to employees; this limitation is not intended to limit the applicability of this Code, which applies equally in all respects to directors, officers and employees, even if not specifically stated.

***

## I.     FUNDAMENTAL PRINCIPLES

The Company and its directors, officers and employees will comply with the letter and the spirit of all applicable laws, rules and regulations and will conduct its affairs in the highest moral and ethical manner possible. We obey laws, rules and regulations, whether we agree with them or not.

***

## II.    RESPONSIBILITY FOR IMPLEMENTATION AND COMPLIANCE; REPORTING

Responsibility for ensuring that employees are familiar with the laws and regulations covering the Company's business and that they comply with those laws and regulations rests with the supervisors, managers, officers and directors of the Company.

The Company's policy is that directors, officers and employees should immediately report any suspected violations of laws, rules or regulations or unethical conduct (including violations of this Code) connected with the business of the Company or its subsidiaries to their supervisor and the Corporate Secretary.

***

III.   **BUSINESS ETHICS AND INTEGRITY**

\*\*\*

C.   **BUSINESS RELATIONSHIPS**

\*\*\*

2.   Financial Integrity. The financial accountability system of the Company was established to properly record and control all financial transactions of the Company. The improper or illegal use of the Company's assets or credit or the misuse of the Company's accountability system is prohibited.

c.   No false or artificial entries shall be made in the books and records of the Company for any reason, and no employee shall engage in any arrangement that results in the making of any false entry in the books and records of the Company.

\*\*\*

K.  **COMPLIANCE WITH LAWS, RULES AND REGULATIONS**

It is the Company's policy to observe and comply with all governmental laws, rules and regulations applicable to it or the conduct of its business wherever located. Directors, officers and employees should comply with all governmental laws, rules and regulations, including insider trading laws. In some situations the applicable governmental laws, rules and regulations of the United States may conflict with the applicable law of another country. In such cases, the Company will endeavor to resolve such a conflict following the advice of its legal counsel. Where such a conflict cannot be resolved, the applicable law of the United States will be observed and complied with by the Company.

\*\*\*

L.  **SEC DISCLOSURES AND PUBLIC COMMUNICATIONS**

It is the Company's policy to insist upon full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with or submits to the SEC and in other public communications made by the Company.

This requirement shall be applicable to the Company's CEO, senior financial officers and all other officers and employees who play a role in drafting, making or disseminating of these reports, documents and communications.

Each employee, including the CEO and each senior financial officer, shall promptly

bring to the attention of the Corporate Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities as specified in the Company's Disclosure Control Policy and Procedures Manual.

The CEO and each senior financial officer shall promptly bring to the attention of the Corporate Disclosure Committee and the Audit Committee any information he or she may have concerning (i) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls. All other employees shall promptly bring any such information to the attention of the Corporate Secretary, or may report anonymously via the Hotline.

*** 

## V.      SAFETY. HEALTH AND THE ENVIRONMENT

### A.  SAFETY AND HEALTH

The Company conducts its operations with the highest regard for safe and healthful working conditions for employees and for the protection of the general public, making all reasonable efforts to comply with the letter and the spirit of existing governmental safety legislation and established regulations. Audits of operating locations will be carried out by properly trained specialists to assure a safe and healthful working environment. All inspections carried out under the authority of or by a governmental agency shall be responded to promptly, issues resolved and practical corrective actions taken as appropriate.

### D.  THE ENVIRONMENT

It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities. The Company will routinely review the conduct of its operations in an effort to strive for continuous improvement in its environmental performance.

152.     In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Defendants Best, Boswell, Kelley, Ables, Brock, and Delaney ("the Audit Committee Defendants"), owed specific duties to Cabot under the Audit

Committee Charter (the "Audit Charter").[6] Specifically the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

> The Audit Committee is appointed by the Board of Directors to assist the Board of Directors in overseeing (1) the integrity of the financial statements of the Company, (2) the compliance by the Company with legal and regulatory requirements, (3) the independence, qualifications and performance of the Company's independent auditors and (4) the performance of the Company's internal audit function.
>
> \*\*\*
>
> The Audit Committee shall, to the extent it deems necessary or appropriate:
>
> 1. Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board of Directors for approval.
>
> 2. Review and discuss with management and the independent auditors the annual audited financial statements, as well as disclosures made in management's discussion and analysis of financial condition and results of operations in the Company's Annual Report on Form 10-K.
>
> 3. Recommend to the Board of Directors whether the Company's annual audited financial statements and accompanying notes should be included in the Company's Annual Report on Form 10-K.
>
> 4. Prepare and approve the audit committee report required to be included in the Company's proxy statement for the annual meeting (or in the Company's Annual Report on Form 10-K if required to be included therein).
>
> 5. Review and discuss with management and the independent auditors the Company's quarterly financial statements, as well as disclosures made in management's discussion and analysis of financial condition and results of operations, including any matters provided in Statement on Auditing Standards No. 100 (significant events during auditor's quarterly review, such as a material change in accounting principles, a significant subsequent event or significant accounting adjustments) arising in connection with the Company's quarterly financial statements prior to the filing of the Company's Quarterly Report on Form 10-Q.
>
> \*\*\*
>
> 11. Meet periodically with management and the internal auditors to review the Company's major financial risk exposures and the steps management has taken

---

[6] See Cabot's Audit Committee Charter at:
https://s26.q4cdn.com/162280839/files/doc_downloads/governance/Audit-Committee-Charter-7-27-16.pdf

to monitor and control those exposures; and discuss the Company's policies and guidelines concerning financial risk assessment and financial risk management.

***

13. Review the disclosures that the Company's chief executive officer and chief financial officer make to the Audit Committee and the independent auditors in connection with the certification process for the Company's Reports on Form 10-K and Form 10-Q concerning any significant deficiencies or weaknesses in the design or operation of internal control over financial reporting and any fraud that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

***

27. Review with the Company's Legal Counsel legal matters that may have a material impact on the Company's financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

153.   In violation of the Audit Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants failed to properly oversee the Company's compliance with its own policies and regulatory requirements, leading to materially false and misleading statements regarding Cabot's operations.

154.   In addition to the Code of Conduct and Audit Charter, the Individual Defendants who served on the Environment, Health & Safety Committee, formerly known as the Safety and Environmental Affairs Committee, during the Relevant Period, the Safety and Environmental Committee Defendants, owed specific duties to Cabot under the Environment, Health & Safety Committee Charter (the "Safety and Environmental Charter").[7] Specifically, the Safety and Environmental Charter provided for the following responsibilities of the Safety and Environmental Committee Defendants:

---

[7] See Cabot's Safety and Environmental Charter at:
https://s26.q4cdn.com/162280839/files/doc_downloads/governance/EHS-Charter-2.19.20.pdf

Purpose

The purpose of the Committee shall be to provide assistance to the Board of Directors in providing oversight and support of the Company's policies, programs and initiatives on the environment, health and safety.

Responsibilities and Duties

\*\*\*

1. Overseeing and providing recommendations to the Board of Directors regarding the Company's climate change and sustainability policies and programs, including the Company's commitment to minimizing its impact on the environment and protecting the health and safety of its workers and the communities in which it operates, as well as overseeing and providing recommendations on the reporting and public disclosure thereon.

\*\*\*

3. Reviewing and providing input to management and the Board of Directors regarding the Company's compliance with laws, regulations, policies, programs and practices with regard to environmental, health and safety matters by, among other things, receiving and reviewing with management reports regarding:

   a. the Company's management of and responses to releases, investigations, notices of violations, remediations, civil action or other occurrences involving environmental laws or regulations;

   b. the Company's safety program, including reports of incidents, statistics and actions or investigations by any governmental body, as well as the Company's response to the same;

   c. the Company's management of and responses to pending legislative and regulatory efforts in the environmental, health and safety and areas likely to significantly affect the Company's business;

   d. environmental, health and safety matters relating to the Company's projects and operations and initiatives and training designed to improve the Company's performance with regard to such matters; and

   e. the Company's efforts to gather data and communicate externally regarding its environmental, health and safety sustainability programs, initiatives and outcomes.

4. Consulting with the Board of Directors and internal and external advisers of the Company, as appropriate, regarding the management of the Company's health,

safety and environmental programs, trends in environmental compliance and the economic effect of such trends on the Company's business.

5. Overseeing and reviewing all external disclosures regarding the Company's environmental, health and safety sustainability data, programs, initiatives and outcomes and providing insight and recommendations to the Board of Directors on such matters.

155.    In violation of the Safety and Environmental Charter, and their general duties as members, the Safety and Environmental Committee Defendants failed to properly oversee the Company's compliance with its own policies and regulatory requirements, leading to materially false and misleading statements regarding Cabot's operations.

## BREACHES OF DUTIES

156.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Cabot, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

157.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, in connection with the Spin-Off. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Cabot substantial damage.

158.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Cabot's public statements and internal

control function.

159.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Cabot, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Cabot has expended, and will continue to expend, significant sums of money.

## DAMAGES TO CABOT

160.    The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

      (a)    Possible restatements and goodwill impairments;

      (b)    Liability arising from the Securities Class Action;

      (c)    The loss of credibility with customers and suppliers; and

      (d)    Legal and accounting costs associated with litigation, investigations and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

161.    Plaintiff brings this action derivatively and for the benefit of Cabot to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Cabot, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

162.    Cabot is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.   Plaintiff is, and has been continuously at all relevant times, a stockholder of Cabot. Plaintiff will adequately and fairly represent the interests of Cabot in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

164.   Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

165.   A pre-suit demand on the Board of Cabot is futile and, therefore, excused. At the time of filing of this action, the Board consists of Individual Defendants Ables, Best, Boswell, Brock, Delaney, Dinges, Kelley, Ralls, and Watts, the Director Defendants. Plaintiff needs only to allege demand futility as a majority of the Directors who are on the Board at the time this action is commenced.

166.   Demand is excused as to all of these directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

167.   In complete abdication of their fiduciary duties, these directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, these directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

168.    Demand on Defendant Kelley is futile because Defendant Kelley has served as a Company director since 2003. He also serves as a member of the Audit Committee. Defendant Kelley has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Kelley signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Kelley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Demand on Defendant Best is futile because Defendant Best has served as a Company director since 2008. Defendant Best has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Best signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Best breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Demand on Defendant Ralls is futile because Defendant Ralls has served as a Company director since 2011. Defendant Ralls has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Ralls signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Ralls breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Demand on Defendant Ables is futile because Defendant Ables has served as a Company director since 2015. She also serves as Chairman of the Audit Committee. Defendant

Ables has received and continues to receive compensation for her role as a director as described herein. Furthermore, Defendant Ables signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Ables breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

172.    Demand on Defendant Boswell is futile because Defendant Boswell has served as a Company director since 2015. He also serves as the Chairman of the Environment, Health and Safety Committee and as a member of the Audit Committee. Defendant Boswell has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Boswell signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Boswell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Demand on Defendant Brock is futile because Defendant Brock has served as a Company director since 2017. She also serves as a member of the Company's Audit and Environment, Health and Safety Committees. Defendant Brock has received and continues to receive compensation for her role as a director as described herein. Furthermore, Defendant Brock signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Brock breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

174.    Demand on Defendant Watts is futile because Defendant Watts has served as a Company director since 2017. He also serves as a member of the Environment, Health and Safety

Committee. Defendant Watts has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Watts signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Watts breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.   Demand on Defendant Delaney is futile because Defendant Delaney has served as a Company director since 2018. He also serves as a member of the Audit and Environment, Health and Safety Committees. Defendant Delaney has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Delaney signed, and thus personally made the false and misleading statements in the 2018 10-K and 2019 10-K. For these reasons, Defendant Delaney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.   Demand on Defendant Dinges is futile because Defendant Dinges is Cabot's CEO, and therefore is not independent under NYSE listing rules. His position at Cabot is his primary source of income, therefore he could not disinterestedly consider a demand action on directors who control his primary employment. Defendant Dinges personally issued the misleading statements alleged herein and signed SOX certifications for the SEC filings. Furthermore, Defendant Dinges is a defendant in the Securities Class Action. Dinges also sold 66,610 shares during the Relevant Period at an inflated price of $27.92, yielding $1,859,751 in proceeds. The actual value of the stock was $19.40; therefore, he should have received $1,292,234 in proceeds. Dinges received an extra $567,517 due to the inflated stock price. For these reasons, Defendant Dinges breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Directors breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

178.    The Director Defendants have longstanding business relationships with each other and the Individual Defendants which means they cannot act independently and in the best interests of the Company. Thus, demand upon the Director Defendants would be futile.

179.    Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

180.    Pursuant to the Company's Safety and Environmental Charter, the Safety and Environmental Committee Defendants are responsible for overseeing, among other things, the programs and practices regarding environmental, health, and safety matters. This includes

management of notices of violations, responding to governmental investigations regarding safety, and reviewing all disclosures regarding the Company's environmental, health, and safety initiatives and outcomes.  The Safety and Environmental Committee Defendants failed to ensure the integrity of the Company's safety and environmental controls, as they are charged to do under the Safety and Environmental Charter, and allowed the Company to issue misleading financial statements with the SEC. Thus, the Safety and Environmental Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

181.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' issuance of materially misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

182.    Cabot has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Cabot any part of the damages Cabot suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

183.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

184.    The acts complained of herein constitute violations of fiduciary duties owed by Cabot's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

185.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cabot. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Cabot, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

186.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Cabot to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

187.     Thus, for all the reasons set forth above, all of the Director Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

188.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

190.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

191.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

192.     The Proxies also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct. The Proxies were also false and misleading because, despite assertions to the contrary, Cabot's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

193.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

194.     The false and misleading elements of the Proxies led to the re-elections of all of the Director Defendants, allowing them to continue breaching their fiduciary duties to Cabot.

195.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

196.     Plaintiff on behalf of Cabot has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    The Individual Defendants, by virtue of their positions with Cabot and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Cabot and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Cabot to engage in the illegal conduct and practices complained of herein.

199.    Plaintiff on behalf of Cabot has no adequate remedy at law.

**THIRD CLAIM**

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cabot's business and affairs.

202.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

203.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cabot.

204.    In breach of their fiduciary duties, the Individual Defendants caused the Company

to engage in the misconduct described herein.

205.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

206.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that Cabot was on track to achieve its financial projections, yet failed to disclose major problems which included: (i) Cabot's environmental controls and procedures for gas wells in Susquehanna County, Pennsylvania were insufficient; (ii) this caused Susquehanna's water supplies to be polluted and endangered its citizens; (iii) these environmental liabilities exposed Cabot to increased governmental scrutiny; (iv) the Company's failure to fix the faulty wells exposed itself to potential civil and/or criminal liabilities; and (v) Cabot would be incapable of achieving its financial projections.

207.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

208.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

209.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

210.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

211.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cabot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Cabot.

215.    The Individual Defendants either benefitted financially from the improper conduct,

received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Cabot tied to the performance or artificially inflated valuation of Cabot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

216.    Plaintiff, as a stockholder and a representative of Cabot, seeks restitution from the Director Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

217.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Cabot will lose financing from investors and business from future customers who no longer trust the Company and its products.

220.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

221.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## PRAYER FOR RELIEF

222.        **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.        Declaring that Plaintiff may maintain this action on behalf of Cabot, and that Plaintiff is an adequate representative of the Company;

B.        Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cabot;

C.        Determining and awarding to Cabot the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.        Directing Cabot and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Cabot and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)        A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)        A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)        Awarding Cabot restitution from Individual Defendants;

4)        Awarding Plaintiff the costs and disbursements of this action,

64

including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just

and proper.

Dated: January 21, 2021                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           By: /s/ Jacob A. Goldberg
                                           Jacob A. Goldberg
                                           101 Greenwood Avenue, Suite 440
                                           Jenkintown, PA 19046
                                           Tel: (215) 600-2817
                                           Fax: (212) 202-3827
                                           Email: jgoldberg@rosenlegal.com

                                           Local Counsel for Plaintiff

                                           and
                                           **LEVI & KORSINSKY, LLP**
                                           Gregory M. Nespole
                                           55 Broadway, 10th Floor
                                           New York, NY 10006
                                           T. 212.363.7500
                                           F. 212.363.7171
                                           gnespole@zlk.com

                                           *Attorneys for Plaintiff Robert Isaacs*

**VERIFICATION**

I, Robert Isaacs, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: Robert Isaacs                    Date: 1/15/2021